```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF GEORGIA
                         AUGUSTA DIVISION
```

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2021 AUG -9  A II: 19

CLERK_____
SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) INFORMATION NO. |
| v. | )<br>)<br>) 18 U.S.C. § 371 |
| WILLIAM J. SIVETER<br>JAMES D. EGAN | ) Conspiracy<br>) |

**CR 1 2 1 - 5 8**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

Introduction

At all times material to this Information:

1.  Beginning no earlier than March 2019 and continuing through September 2019, William J. Siveter and James D. Egan, together with known and unknown co-conspirators, in the Southern District of Georgia and elsewhere, conspired to engage in a kickback scheme targeted at the Medicare program in which Siveter and Egan trafficked in cancer genomic ("CGx") testing orders in exchange for money. As part of the conspiracy, Siveter and Egan paid marketers, including Patrick Siado, to obtain personal identifying information, Medicare and Medicaid benefit numbers, and buccal swabs of saliva. Siveter and Egan then sold these to a company that routed the patient information, buccal swabs, and accompanying doctors orders to one or more laboratories, which then billed Medicare and other health benefit programs. These laboratories then submitted significant fraudulent reimbursements to the Medicare program for genetic testing that exceeded $45 million in billings.

1

2. The Medicare Program, a "health care benefit program" as defined by 18 U.S.C § 24, is a federally-funded health insurance system for eligible persons 65 years of age and older, and certain disabled persons. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

3. The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A and Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments for enrolled beneficiaries to the Medicare Advantage programs.

4. After receiving a Medicare National Provider Identifier ("NPI") and Provider Transaction Access Number, a provider can submit bills to Medicare, known as "claims," in order to obtain reimbursement for items or services provided to Medicare beneficiaries. Claims to Medicare are typically submitted electronically and require certain information, including (a) the Medicare beneficiary's name and identification number, (b) identification of the benefit, item, or service provided or supplied to the Medicare beneficiary, (c) the billing code for the benefit, item, or service, (d) the date upon which the benefit, item, or health services was provided, and (e) the name and NPI of the medical practitioner who ordered the service, treatment, benefit, or item.

5. To qualify for payment, the health care benefit, item or service must have been ordered by a licensed medical practitioner, medically necessary, provided as billed, and provided in compliance with applicable laws.

## COUNT ONE
*Conspiracy*
18 U.S.C. § 371

6. The allegations of paragraphs 1 through 5 of this Information are hereby realleged and incorporated as if fully set forth herein.

7. Beginning not later than March 2019, and continuing until on or about September 2019, the exact date being unknown, in the Southern District of Georgia and elsewhere, William J. Siveter and James D. Egan did knowingly and willfully combine, conspire, confederate, and agree together and with others known and unknown, to commit one or more offense against the United States, that is,

   a) to knowingly and willfully solicit and receive remuneration, including kickbacks, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce a person to order an item for which payment may be made in whole and in part under a federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1); and

   b) to knowingly and willfully offer and pay remuneration, including kickbacks, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce a person to refer an individual for the furnishing and arranging for the furnishing of an item or service for which payment may be

made in whole and in part under a federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

### Purpose of the Conspiracy

8. It was the purpose of the conspiracy for Siveter, Egan, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) causing the submission of false and fraudulent claims to Medicare that were (i) procured by the payment of kickbacks; (ii) medically unnecessary; (iii) ineligible for Medicare and Medicaid reimbursement; and/or (iv) not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare and Medicaid and the receipt and transfer of the proceeds from the fraud; and (c) using the proceeds of the fraud for the personal use and benefit of Siveter, Egan, and their accomplices.

### Manner and Means of the Conspiracy

9. The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and the purpose of the conspiracy included, among other things:

10. Operating through Siveter and Egan's company, Direct Medical Testing ("DMT"), Siveter and Egan were marketers who sold cancer genomic ("CGx") testing for Medicare beneficiaries and other health benefit programs to Company A. Company A paid DMT a set amount for every CGx test sent to Company A by DMT, though Company A asked DMT to invoice Company A in a manner that made the

relationship between Company A and DMT appear facially compliant with the Anti-Kickback Statute.

11. Specifically, Company A requested DMT invoice Company A for marketing hours instead of per CGx test. Siveter and Egan, through DMT, followed Company A's instructions and invoiced Company A for marketing hours, knowing the same to be fabricated and that the actual dollar amount invoiced was for CGx and other lab tests sent to Company A by DMT and that Company A was paying on a per-referral basis.

12. Through DMT, Siveter and Egan also hired marketers and patient recruiters underneath DMT to target Medicare beneficiaries at health fairs, senior centers, and other locations, and to induce those Medicare beneficiaries to accept CGx tests regardless of medical necessity.

13. One of those marketers paid by Siveter and Egan through DMT was Patrick Siado. Siado organized networks of individuals and arranged for their transportation to communities with low-income and elderly individuals in the Augusta, Georgia area, within the Southern District of Georgia, and elsewhere. Siado and others affiliated with Siado then went door-to-door to obtain personal identifying information, such as Medicare and Medicaid benefit numbers, along with buccal swabs of saliva. Siado would then transmit patient identification and the buccal swabs to DMT, which DMT in turn sent to Company A.

14. Siveter, Egan, and their co-conspirators would then arrange for a "telemedicine" physician to order the test as "medically necessary" for the patients

identified by Siado and other marketers, despite the fact that the physician never met the patient, let alone established a legitimate physician-patient relationship, as required.

15. The co-conspirators would then transmit the identities of Medicare and Medicaid beneficiaries, swabs, and corresponding "telemedicine" physician orders to laboratories, including Company B, which then submitted claims to Medicare and Medicaid. Company B, among other laboratories, would then bill Medicare and Medicaid using the identities of the individuals gathered by DMT's marketers.

16. From in or around March 2019 through September 2019, Siveter and Egan's company DMT received illegal kickbacks and bribes exceeding $2 million from Company A in exchange for the referral of Medicare beneficiaries for CGx tests.

### Overt Acts

17. In furtherance of the conspiracy and to effect the illegal objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Georgia and elsewhere:

18. On or about May 13, 2019, Siado obtained the identities and buccal swabs from numerous patients within the Augusta, Georgia area, within the Southern District of Georgia, including individuals E.C., J.B., and P.E.

19. On or about July 15, 2019, DMT paid a company run by Siado $19,890 in exchange for CGx tests.

20. On or about July 19, 2019, Siado organized a meeting to recruit new individuals to obtain "customers" for a laboratory, during which meeting Siado

offered to pay $150 "per swab" for each Medicare or Medicaid patient an individual obtained.

21. On or about July 22, 2019, DMT paid a company run by Siado $6,120 in exchange for CGx tests.

22. On or about July 22, 2019, Company A paid DMT $204,100 in exchange for CGx tests.

23. On or about July 23, 2019, DMT paid a company run by Siado $12,300 in exchange for CGx tests.

24. On or about August 14, 2019, Company A paid DMT $400,000 in exchange for CGx tests.

All done in violation of Title 18, United States Code, Section 371.

Karl I. Knoche
Assistant United States Attorney
Chief, Criminal Division

Jonathan A. Porter
Assistant United States Attorney
*Lead Counsel